UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | |
|---|---|
| DIANE A. SCHULTE, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | 4:08CV1652 HEA |
| ) | (TIA) |
| MICHAEL J. ASTRUE, ) | |
| COMMISSIONER OF SOCIAL SECURITY, ) | |
| ) | |
| Defendant. ) | |

## REPORT AND RECOMMENDATION

This matter is before the Court under 42 U.S.C. §§ 405(g) and 1383(c)(3) for judicial review of the denial of Plaintiff's applications for Disability Insurance Benefits under Title II of the Social Security Act and for Supplemental Security Income under Title XVI of the Act . The case was referred to the undersigned pursuant to 28 U.S.C. § 636(b).

## I. Procedural History

On September 11, 2006,[1] Plaintiff filed an application for Disability Insurance Benefits ("DIB"), alleging disability beginning December 1, 2002 due to depression, a bad right ankle, difficulty walking, a bad left knee, and low back injury. (Tr. 11, 78-82, 113) Plaintiff's application was denied, after which she requested a hearing before an Administrative Law Judge ("ALJ"). (Tr. 44, 47-51, 54) She then filed an application for Supplemental Security Income ("SSI") on October 16, 2007, which was consolidated with her DIB application. (Tr. 11,83-86) Plaintiff's disability allegations included "depression, bad right ankle, hard to walk, bad left knee, low back injury, can't lift heavy things, arthritis, and anxiety." (Tr. 43)

---

[1] The application is dated September 11, 2006. However, in his decision, the ALJ notes that Plaintiff protectively filed her application on June 23, 2006. (Tr. 11, 20)

On January 9, 2008, Plaintiff testified at a hearing before an ALJ and was accompanied by her attorney. (Tr. 23-42) In a decision dated January 30, 2008, the ALJ found that Plaintiff was not disabled with respect to her DIB application. However, with regard to her application for SSI, the ALJ determined that Plaintiff had been disabled since October 16, 2007. (Tr. 11-20) Thereafter, the Plaintiff filed a request for review with the Appeals Council, which denied said request on August 22, 2008. (Tr. 1-6) Thus, the decision of the ALJ stands as the final decision of the Commissioner.

## II. Evidence Before the ALJ

At the hearing dated January 9, 2008, Plaintiff testified that she was born on August 22, 1952. She lived alone in a duplex. Plaintiff completed the eleventh grade and did not receive a GED. Plaintiff was 5 feet, 9 ½ inches, and she weighed 250 pounds. She was certified as a nurse's aide. Plaintiff testified that she last worked full time in 2004 at the St. Joseph's Nursing Home as a nurse's aide. plaintiff described her duties as showering people, feeding them, and getting them up and down for naps. The job required walking, lifting patients, and carrying patients. Some patients weighed over 200 pounds. Prior to working for St. Joseph's Plaintiff worked for a physical therapy company, helping residents walk and exercise. Plaintiff testified that she lifted patients and was up walking and moving all day long. She also previously worked for PT Providers, performing the same duties. After working for St. Joseph's, Plaintiff worked cleaning houses. Plaintiff testified that she cleaned about 3 houses per week and that each house took 3 to 4 hours, during which time she carried cleaning supplies and the vacuum up the stairs, swept, mopped, and vacuumed. She then worked 2 hours a week at a Hallmark shop, stacking the card shelves. Plaintiff stopped working in March of 2007 when she had double fusion surgery on her right foot. (Tr. 26-31)

Plaintiff testified that she could not return to any of her previous jobs because her "body [was] falling apart." Her right ankle hurt despite the past surgery. She opined that she could walk about

one block. Plaintiff rated the pain in her ankle as a 7 or 8 out of 10. She took Morphine twice a day for the pain. Additionally, Plaintiff stated that she experienced pain in her left knee. she had total knee replacement surgery on August 27, 2007, but she still had constant pain, which she rated as an 8. Plaintiff occasionally used a cane. Plaintiff also had back problems, for which she received injections every few months over the past two years. Plaintiff described the pain as a constant "10" and testified that the pain radiated down both legs. Medication provided a little relief, as well as ice packs, hot packs, and exercises. (Tr. 32-35)

Plaintiff testified that she had been treated by Dr. Baak, a rheumatoid arthritis doctor, since 2005. Dr. Baak treated Plaintiff for arthritis in her fingers, back, and shoulders. Although Plaintiff could lift a cup of water, she stated that she could not lift over 5 pounds. Lifting a gallon of milk was difficult. Plaintiff further testified that her fingers were beginning to curl, and she had difficulty buttoning and opening jars. In addition, Plaintiff was unable to reach over her head. She estimated that she could stand for about 20 minutes and sit for about 25 minutes before needing to stand up and stretch. (Tr. 35-36)

Plaintiff also testified that she suffered from depression. She was treated by a psychiatrist, Dr. Graywall, and her primary care physician, Dr. Jordan. Plaintiff stated that she took 30 milligrams of Lexapro for depression, and Seroquil for panic attacks. Plaintiff began receiving Medicaid two years prior to the hearing, and she noted that the absence of treatment before that time was due to a lack of insurance. (Tr. 36-37)

During an average day, Plaintiff woke up and made breakfast, sat in the house all day, and piddled around. She cooked a little bit and grocery shopped while riding a cart. Plaintiff's children and friends helped clean the house and do the laundry. Plaintiff attended church but not on a regular basis. She enjoyed doing jigsaw puzzles and word puzzles, along with reading and watching TV.

(Tr. 37-38)

Plaintiff further stated that she experienced side effects from her medications. She became dizzy and nauseated, and she generally did not feel good. Plaintiff also testified that she had high blood pressure and high cholesterol. Her blood pressure was controlled with medication, although her blood pressure increased when she was upset or bothered. (Tr. 38-39)

### III. Medical Evidence

On January 3, 2005, Plaintiff underwent a stress test, which was abnormal with exertional chest discomfort. (Tr. 157) Between December 2004 and September 2005, Plaintiff presented to the Mercy Medical Group with complaints of chest pain, coughing, wheezing, body aches, dizziness, fever, ear pain, high blood pressure, high cholesterol, and anxiety. Musculoskeletal examinations were normal. (Tr. 153-58) She complained of horrible pain in her legs and ankles in May of 2006. (Tr. 151-52) On June 19, 2006, an x-ray of Plaintiff's right ankle revealed severe degenerative joint space narrowing and spurring. The impression was degenerative arthritis. (Tr. 148) A Radiology Exam Report dated July 10, 2006 showed a small amount of joint effusion in the suprapatellar bursa of Plaintiff's left knee, along with severe degenerative changes at 3 compartments with severe joint space narrowing and marginal spurring. (Tr. 144)

After an MRI of Plaintiff's lumbar spine on November 20, 2006, Plaintiff was diagnosed with mild anterolisthesis of L4 anteriorly relative to L5 due to degenerative changes; degenerative disc disease and diffuse disc bulges in the lumbar spine, worst at the L4-L5 level; mild spinal canal stenosis at L4-L5 due to diffuse disc bulge, anterolisthesis, and degenerative changes; mild foraminal narrowing on the right at L4-L5 due to diffuse disc bulge and degenerative changes; and fluid in the facet joints at L4-L5 bilaterally due to degenerative joint disease changes. (Tr. 141-42)

Plaintiff saw Dr. Steven Baak, a rheumatologist, for her arthritis beginning in May 2006, at

which time he assessed degenerative arthritis in the hands, post-traumatic arthritis of the right ankle, and left carpal tunnel syndrome. Dr. Baak also noted that Plaintiff was anxious and depressed. On June 27, 2006, Dr. Baak stated that Plaintiff had bad degenerative disease of the knee and right ankle. Plaintiff also had low back pain and walked with an abnormal gait. In a September 19, 2006 letter written to Plaintiff's primary care physician, Dr. Heather Jordan, Dr. Baak noted:

> Diane has dramatic degenerative arthritis of the hands and a very debilitating degenerative arthritis of the right ankle. She has a loss of range of motion at the ankle and walks with a dramatic limp. . . . At this point she remains completely disabled due to her severe osteoarthritis of the ankle and based on the dramatic bony enlargement of the ankle and the loss of range of motion, I do not anticipate that she will be able to return to work in the future.

(Tr. 234, 236-241)

On August 2, 2006, Dr. Baak completed an Arthritis Residual Functional Capacity Questionnaire. Dr. Baak listed Plaintiff's prognosis as "poor" and stated that her symptoms included pain primarily in her legs and back, insomnia, and fatigue. Plaintiff was not a malingerer, and emotional factors contributed to her symptoms and functional limitations. Dr. Baak opined that Plaintiff was incapable of even low stress jobs. Dr. Baak estimated that Plaintiff could walk one city block without rest or severe pain; sit more than two hours before needing to get up; stand 10 minutes before needing to sit down or walk around; sit at least 6 hours in an 8-hour workday; and stand/walk less than 2 hours in an 8-hour workday. Further, Plaintiff needed to take 2 to 3 unscheduled breaks during a workday. Dr. Baak additionally opined that Plaintiff could rarely lift and carry less than 10 pounds and never lift or carry any heavier weight. Plaintiff could only rarely stoop but never twist, crouch, climb ladders, or climb stairs. Plaintiff's impairments were likely to produce good and bad days, and Dr. Baak opined that Plaintiff would be chronically absent from work as a result of her impairments. (Tr. 217-23)

From December 2006 to December 2007, Plaintiff received Pain Management Services primarily for low back pain which radiated into her legs and feet. Her initial assessment revealed lumbar spinal stenosis and lumbar facet arthropathy. Plaintiff received epidural steroid injections and later, bilateral lumbar facet injections for the pain. Dr. Todd Bailey also assessed lumbar radiculopathy, lumbago, and lumbar spondylosis, and he added a prescription for Neurontin to the injections. Dr. Bailey additionally noted that Plaintiff took Morphine prescribed by her rheumatologist, along with Seroquel and Lexapro prescribed by her psychiatrist for depression. (Tr. 194-215)

Medical records from Dr. William C. Schroer in 2007 demonstrated that Plaintiff underwent right ankle fusion surgery in March and left total knee arthroplasty in August. Plaintiff's right ankle healed, and she was able to tolerate weight-bearing. In addition, Plaintiff's made ongoing improvement after her knee replacement. (Tr. 182-93, 243-49, 261-64) Dr. Christopher Johnson, who performed the right ankle fusion, completed a Physical Residual Functional Capacity Questionnaire, diagnosing severe degenerative osteoarthritis of the right foot and ankle and listing her prognosis as stable. Dr. Johnson opined that the pain was severe enough frequently interfere with Plaintiff's attention and concentration. Further, Plaintiff was capable of low stress jobs so long as she remained seated. Dr. Johnson stated that Plaintiff could stand/walk less than 2 hours and sit at least 6 hours during an 8-hour workday. She would need to take unscheduled breaks every 1 to 2 hours for 10-15 minutes. Further, she could rarely lift 10 pounds or less but could never lift 20 pounds or more. (Tr. 266-68)

### IV. The ALJ's Determination

In a decision dated January 30, 2008, the ALJ found that Plaintiff met the insured status requirements of the Social Security Act through September 30, 2005. Plaintiff had not engaged in

substantial gainful activity since December 1, 2002, her alleged onset date. Further, the ALJ determined that Plaintiff had the following severe impairments: "hypertension, hyperlipidemia, spinal canal stenosis at L4-5, mild anterolisthesis at L4 relative to L5, a cyst, spurring and joint space narrowing in her left foot, degenerative arthritis and degenerative joint space narrowing in her right ankle, and osteoarthritis and degenerative changes in three compartments in her left knee." However, during the period between Plaintiff's alleged onset date through the date she was last insured, Plaintiff's only impairments were hypertension and hyperlipidemia. Since Plaintiff's alleged onset date, she did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (Tr. 13-14)

The ALJ found that, as of September 30, 2005, the Plaintiff had the residual functional capacity ("RFC") to lift up to a maximum of 20 pounds and frequently lift 10 pounds. Further, she could stand or walk up to 6 hours in an 8-hour workday and sit up to 6 hours in an 8-hour workday. She could perform the full range of light work. The ALJ noted that Plaintiff's only medical records prior to September 30, 2005 indicated complaints of right ankle swelling, left foot cramps, mental impairments, chest pain and dyspnea, hypertension, and hyperlipidemia. However, the record was void of any clinical testing such as x-rays or MRIs. In short, the ALJ found that the lack of significant treatment and the lack of significant functional limitations resulting from her alleged impairments prior to September 30, 2005 undermined Plaintiff's credibility pertaining to her allegations of impairments existing as of her date last insured. (Tr. 14-16)

However, the ALJ further found that, beginning October 16, 2007, Plaintiff had the RFC to occasionally lift no more than 10 pounds. Further, the ALJ found Plaintiff could stand or walk no more than 2 hours in an 8-hour workday. Her impairments would interfere with her concentration, persistence, and pace, and they would leave her unable to sustain work-related physical activities on

a regular and continuing basis. The ALJ considered the medical evidence, including objective testing, which indicated impairments to the left knee and foot, right ankle, and lumbar spine. The ALJ also rejected the state agency consultant's opinion, noting that the evidence received at the hearing level showed that Plaintiff was more limited than the agency previously determined. (Tr. 16-18)

The ALJ further determined that Plaintiff had past relevant work as a physical therapy aide. As of her date last insured, Plaintiff was closely approaching advanced age and remained in that category until August 21, 2007. When she filed her October 16, 2007 SSI application, she was 55 years old, which was defined as advanced age. Plaintiff had an 11th grade education, and transferability of job skills was not material to a disability determination. The ALJ found that, as of September 30, 2005, considering Plaintiff's age, education, work experience, and RFC, a significant number of jobs existed in the national economy which Plaintiff could have performed. Because Plaintiff did not meet her burden and prove disability prior to her date last insured, she did not qualify for a period of disability or disability insurance benefits. Therefore, the ALJ concluded that Plaintiff was not disabled for the period between October 1, 2005 and the date before she filed her SSI application, which was October 15, 2007. (Tr. 18-19)

Finally, the ALJ determined that beginning on Plaintiff's SSI application date of October 16, 2007, in light of her age, education, work experience, and RFC, there were not a significant number of jobs in the national economy that Plaintiff could perform. While Plaintiff was not disabled prior to October 16, 2007, the ALJ found that she was disabled on that date and continued to be disabled through the date of the decision. Her combination of impairments were not expected to improve and were expected to persist for a continuous period of at least 12 months. Therefore, the ALJ concluded that Plaintiff was disabled beginning on October 16, 2007 and was entitled to supplemental security income. (Tr. 19-20)

## V. Legal Standards

A claimant for social security disability benefits must demonstrate that he or she suffers from a physical or mental disability. 42 U.S.C. § 423(a)(1). The Social Security Act defines disability as "the inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period not less than 12 months." 20 C.F.R. § 404.1505(a).

To determine whether a claimant is disabled, the Commissioner engages in a five step evaluation process. See 20 C.F.R. § 404.1520(b)-(f). Those steps require a claimant to show: (1) that she is not engaged in substantial gainful activity; (2) that she has a severe impairment or combination of impairments which significantly limits her physical or mental ability to do basic work activities; or (3) she has an impairment which meets or exceeds one of the impairments listed in 20 C.F.R., Subpart P, Appendix 1; (4) she is unable to return to her past relevant work; and (5) her impairments prevent her from doing any other work. Id.

The Court must affirm the decision of the ALJ if it is supported by substantial evidence. 42 U.S.C. § 405(g). "Substantial evidence 'is less than a preponderance, but enough so that a reasonable mind might find it adequate to support the conclusion.'" Cruse v. Chater, 85 F. 3d 1320, 1323 (8th Cir. 1996) (quoting Oberst v. Shalala, 2 F.3d 249, 250 (8th Cir. 1993)). The Court does not re-weigh the evidence or review the record de novo. Id. at 1328 (citing Robinson v. Sullivan, 956 F.2d 836, 838 (8th Cir. 1992)). Instead, even if it is possible to draw two different conclusions from the evidence, the Court must affirm the Commissioner's decision if it is supported by substantial evidence. Id. at 1320; Clark v. Chater, 75 F.3d 414, 416-17 (8th Cir. 1996).

To determine whether the Commissioner's final decision is supported by substantial evidence, the Court must review the administrative record as a whole and consider: (1) the credibility findings

made by the ALJ; (2) the plaintiff's vocational factors; (3) the medical evidence from treating and consulting physicians; (4) the plaintiff's subjective complaints regarding exertional and non-exertional activities and impairments; (5) any corroboration by third parties of the plaintiff's impairments; and (6) the testimony of vocational experts when required which is based upon a proper hypothetical question that sets forth the plaintiff's impairment(s). Stewart v. Secretary of Health & Human Servs., 957 F.2d 581, 585-586 (8th Cir. 1992); Brand v. Secretary of Health Educ. & Welfare, 623 F.2d 523, 527 (8th Cir. 1980).

The ALJ may discount plaintiff's subjective complaints if they are inconsistent with the evidence as a whole, but the law requires the ALJ to make express credibility determinations and set forth the inconsistencies in the record. Marciniak v. Shalala, 49 F.3d 1350, 1354 (8th Cir. 1995). It is not enough that the record contain inconsistencies; the ALJ must specifically demonstrate that he or she considered all the evidence. Id. at 1354; Ricketts v. Secretary of Health & Human Servs., 902 F.2d 661, 664 (8th Cir. 1990).

When a plaintiff claims that the ALJ failed to properly consider subjective complaints, the duty of the Court is to ascertain whether the ALJ considered all of the evidence relevant to plaintiff's complaints under the Polaski[2] standards and whether the evidence so contradicts plaintiff's subjective complaints that the ALJ could discount his testimony as not credible. Benskin v. Bowen, 830 F.2d 878, 882 (8th Cir. 1987). If inconsistencies in the record and a lack of supporting medical evidence support the ALJ's decision, the Court will not reverse the decision simply because some evidence may support the opposite conclusion. Marciniak 49 F.3d at 1354.

---

[2]The Polaski factors include: (1) the objective medical evidence; (2) the subjective evidence of pain; (3) any precipitating or aggravating factors; (4) the claimant's daily activities; (5) the effects of any medication; and (6) the claimants functional restrictions. Polaski v. Heckler, 739 F.2d 1320, 1322 (8th Cir. 1984).

## VI. Discussion

In his Brief in Support of the Complaint, the Plaintiff asserts that the ALJ erred in denying Plaintiff's DIB application on the basis of lack of objective medical evidence. Specifically, Plaintiff argues that the ALJ should have considered the more recent medical records as relevant to her disability status prior to the expiration of her insured status. The Defendant, on the other hand, maintains that the medical records were void of any indication that Plaintiff's ankle, knee, or back pain was of disabling severity during the period she was insured. The undersigned finds that substantial evidence does not support the ALJ's determination that Plaintiff was not under a disability prior to the date last insured and was not entitled to DIB and that the case should be remanded for further review.

Plaintiff has the burden of establishing the existence of a disability on or before the expiration of her insured status. Basinger v. Heckler, 725 F.2d 1166, 1169 (8th Cir. 1984). The Plaintiff correctly states that, under Eighth Circuit law, "medical evidence of a claimant's condition subsequent to the expiration of the claimant's insured status is relevant evidence because it may bear upon the severity of the claimant's condition before the expiration of his or her insured status." Id. (citations omitted). However, "[a] nondisabling condition which later develops into a disabling condition after the expiration of a claimant's insured status cannot be the basis for an award of disability benefits under Title II." Stanfield v. Chater, 970 F. Supp. 1440, 1456 (E.D. Mo. 1997) (citations omitted).

Although the medical records do not document any complaints of or treatment for ankle, knee, or back pain prior to the expiration of her insured status, Plaintiff asserts that during the time-period in question, she was unable to afford medical care. She also contends that the ALJ may not penalize her for the lack of objective medical evidence. Instead, Plaintiff argues that the relevant medical evidence which supports the ALJ's determination that Plaintiff is entitled to SSI also relates

back and supports her entitlement to DIB. Further, Plaintiff maintains that the ALJ may not rely solely on the lack of objective medical evidence to support his determination.

The record shows that the ALJ erroneously discredited the Plaintiff's subjective complaints of disabling impairments and pain prior to the expiration of her insured status solely on the lack of objective evidence. "Under Polaski [v. Heckler, 739 F.2d 1320, 1322 (8th Cir. 1984)], a claimant's subjective complaints may not be rejected based solely on the lack of an 'objective medical basis' for them." Samons v. Astrue, 497 F.3d 813, 820 (8th Cir. 2007). "While an ALJ is entitled to consider the lack of objective medical findings when evaluating credibility, this is only one factor to be considered." Barton v. Astrue, 549 F.3d 1106, 1122 (E.D. Mo. 2008) (citing McClees v. Shalala, 2 F.3d 301, 302 (8th Cir. 1993)). The ALJ must demonstrate that he considered all of the evidence relating to Plaintiff's subjective complaints under the Polaski factors. Ford v. Astrue, 518 F.3d 979, 982 (8th Cir. 2008). Upon discounting Plaintiff's complaints, the ALJ need not discuss each factor; however, the ALJ must "'detail the reasons for discrediting the testimony and set for the inconsistencies found.'" Id. (quoting Lewis v. Barnhart, 353 F.3d 642, 647 (8th Cir. 2003)).

Although the ALJ mentions the Polaski factors and Plaintiff's testimony, the ALJ's opinion demonstrates that he discounted Plaintiff's subjective complaints solely on the lack of medical treatment and diagnostic testing during the applicable time period. (Tr. 16) Strict reliance on the absence of objective medical evidence is contrary to Eighth Circuit law. Halpin v. Shalala, 999 F.2d 342, 346 (8th Cir. 1993) (citation omitted). The ALJ makes no mention of Plaintiff's daily activities, and the hearing transcript does not indicate what activities Plaintiff could perform prior to September 30, 2005. Further, there is no indication what Plaintiff's functional restrictions were at that time. The record demonstrates that she had a strong work record as a physical therapy aide from 1988 to 1998. (Tr. 113-14) However, as she testified, she was no longer able to perform any work involving

physical activity after she left that job. (Tr. 30-31)

Further, Plaintiff testified that the record was void of medical treatment prior to the time she began receiving Medicaid because she did not have insurance. (Tr. 37) "A Social Security claimant should not be disfavored because [she] cannot afford or is not accustomed to seeking medical care on a regular basis." Basinger v. Heckler, 725 F.2d 1166, 1170 (8th Cir. 1984).

In addition, as previously stated, medical evidence of Plaintiff's condition after her insured status expired is relevant because it may bear upon the severity of her condition prior to the expiration of her insured status. Id. at 1169 (citations omitted). Merely seven months after her insured status expired, Dr. Baak assessed degenerative arthritis of the hands, posttraumatic arthritis of the right ankle, and left carpal tunnel syndrome. Her pain levels were severe, and her emotional state was a mess. (Tr. 241) Further, less than a year after the expiration of her insured status, Dr. Baak noted that her prognosis was poor and that Plaintiff was not a malingerer. She was incapable of even low stress jobs. (Tr. 217-223) "If the diagnosis is based upon a medically accepted clinical diagnostic technique, then it must be considered in light of the entire record to determine whether it establishes the existence of a physical impairment prior to the expiration of the claimant's insured status." Id. (internal quotations omitted); see also Grebenick v. Chater, 121 F.3d 1193, 1199 (8th Cir. 1997).

Because the ALJ failed to properly assess Plaintiff's credibility under Polaski and failed to determine whether the subsequent diagnoses of degenerative changes in her knees, feet, ankles, and spine related back to the time period before the expiration of her insured status, the undersigned finds that the ALJ's determination is not supported by substantial evidence in the record as a whole. The case should be remanded for further proceedings to allow the ALJ to consider Plaintiff's subjective complaints in light of the Polaski factors during the time period prior to the expiration of her insured

status and to determine the retrospective nature of her subsequent diagnoses.

Accordingly,

**IT IS HEREBY RECOMMENDED** that this cause be **REVERSED** and **REMANDED** to the Commissioner for further proceedings consistent with this Report and Recommendation.

The parties are advised that they have fourteen (14) days in which to file written objections to this Report and Recommendation, unless an extension of time for good cause is obtained, and that failure to file timely objections may result in a waiver of the right to appeal questions of fact. See Thompson v. Nix, 897 F.2d 356 (8th Cir. 1990).

      /s/ Terry I. Adelman  
UNITED STATES MAGISTRATE JUDGE

Dated this  2nd  day of February, 2010.